# ORIGINAL

1

2  LEONARDO M. RAPADAS
   United States Attorney
3  MARIVIC P. DAVID
   Assistant U.S. Attorney
   Sirena Plaza Suite 500
4  108 Hernan Cortez Avenue
   Hagatna, Guam 96910
5  Telephone: (671) 472-7332
   Telecopier: (671) 472-7334

6
   Attorneys for United States of America
7

**FILED**

DISTRICT COURT OF GUAM

AUG - 3 2006 n^bo

MARY L.M. MORAN
CLERK OF COURT

8            **IN THE UNITED STATES DISTRICT COURT**

9               **FOR THE DISTRICT OF GUAM**

10

   UNITED STATES OF AMERICA,        )    CRIMINAL CASE NO. 05-00066
11                                   )
                 Plaintiff,          )
12                                   )
                 vs.                 )    **GOVERNMENT'S RESPONSE TO**
13                                   )    **PRESENTENCE INVESTIGATION**
                                     )    **REPORT AND DEFENDANT'S**
14                                   )    **OBJECTIONS TO PRESENTENCE**
                                     )    **INVESTIGATION**
15                                   )    **REPORT**
                                     )
16   JOSEPH ANTHONY MESA,            )
                                     )
17               Defendant.          )
   ──────────────────────────────────)

18
         The government adopts the findings of the Presentence Investigation Report ("PSR") and
19
   responds as follows to defendant Joseph Anthony Mesa's objections to the PSR:
20
         Substantial Risk of Harm Enhancement
21
         Defendant Mesa pleaded guilty to possession with intent to distribute methamphetamine
22
   hydrochloride. In his plea agreement the defendant admitted that "[o]n September 8, 2005, while
23
   in Room 755 of the Guam Reef Hotel in the District of Guam, the defendant knowingly possessed
24
   less than five (5) grams of methamphetamine hydrochloride with the intent to deliver it to another
25
   person. A forensic chemist analyzed the controlled substance found in the hotel room, and
26
   determined that in the aggregate it was 1.99 grams, net weight, of d-methamphetamine hydrochloride
27
   of 96% purity which is also known as ice."
28

The superseding indictment in the above-captioned case was based on defendant's involvement with other individuals, in part, in the conspiracy to manufacture and distribute methamphetamine hydrochloride in the Guam Reef Hotel. The quantity of drugs attributable to defendant - 1.99 grams of ice - consisted of not only the .99 gram of ice found in a ziploc bag on defendant's person [Exhibit 2], but also the one gram of ice packaged in 11 small straws found on the floor of the hotel room [Exhibit 1], as reflected in ¶¶ 25 and 27 of the PSR and which drugs were actually manufactured in the Guam Reef Hotel. See Exhibits A (DEA lab report of drug Exhibit 1); and B (DEA lab report of drug Exhibit 2).

For sentencing purposes, the defendant's relevant conduct includes: (1) all acts or omissions that the defendant committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused; and (2) all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity. USSG § 1B1.3(a)(1)(A) and (B). Co-defendants Shardae Roxanne U. Love and Jeffrey Anthony Espinosa pleaded guilty to attempt to manufacture ice and admitted to such manufacturing of ice in the Guam Reef Hotel including in Room 755 during September 5, 2005, and September 8, 2005. Defendant was a resident of the Guam Reef Hotel during such time period, and stayed in Room 755 as well. See Exhibit C (Defendant's Motion to File Supplemental Affidavit in Support of Motion to Suppress; Defendant's Supplemental Affidavit in Support of Motion to Suppress).

Defendant's sentence could be enhanced to Level 27 under § 2D1.1(b)(6)(B) if the offense involved the manufacture of methamphetamine and created a substantial risk of harm to human life; or enhanced to Level 30 under § 2D1.1(b)(6)(C) if the offense involved the manufacture of methamphetamine and created a substantial risk of harm to the life of a minor. Indeed the defendant recognized the dangers inherent in methamphetamine labs. See Exhibit D (Excerpt of testimony of Special Agent Danny Cho, Drug Enforcement Administration, Continued Motion to Suppress Hearing on January 25, 2006; and attached Government Exhibits 5, 6, 7, 8, 9, 10 and 11).

2

The court must consider the factors reflected in Note 20 of the commentary for § 2D1.1:

(I)   the quantity of any chemicals or hazardous or toxic substances found at the laboratory, and the manner in which the chemicals or substances were stored;

(ii)   the manner in which hazardous or toxic substances were disposed, and the likelihood of release into the environment of hazardous or toxic substances;

(iii)   the duration of the offense, and the extent of the manufacturing operation;

(iv)   the location of the laboratory (e.g., whether the laboratory is located in a residential neighborhood or a remote area), and the number of human lives placed at substantial risk of harm.

§2D1.1(b)(6)(B) or (C), comment. (n.20(A))

However, a court is not required to identify a specific minor placed at risk of harm but must still make a finding that the defendant's actions placed a minor at risk. United States v. Florence, 333 F.3d 1290, 1293 (11th Cir. 2003). See generally, United States v. Layne, 324 F.3d 464, (6th Cir. 2003), for the legislative history behind the "substantial risk" enhancements under § 2D1.1(b)(6).

A sentencing factor that has an extremely disproportionate effect on sentence must be proved by clear and convincing evidence. United States v. Staten, 450 F.3d 384, 392-394 (9th Cir. 2006). The government intends to call witnesses during the sentencing hearing in support of the contested enhancement.

Dated this 2nd day of August 2006.

LEONARDO M. RAPADAS
United States Attorney
Districts of Guam and CNMI

By:   _____
MARIVIC P. DAVID
Assistant U.S. Attorney

3

**U.S. Department of Justice**
Drug Enforcement Administration*

## REPORT OF DRUG PROPERTY COLLECTED, PURCHASED OR SEIZED

| 1. HOW OBTAINED (Check) | | 2a. FILE NO. | 2b. PROGRAM CODE | 3. G-DEP ID |
|---|---|---|---|---|
| ☐ Purchase  ☒ Seizure  ☐ Free Sample ☐ Lab. Seizure  ☐ Money Flashed  ☐ Compliance Sample (Non-Criminal) ☐ ...ernal Body Carry  ☐ Other (Specify) _____ | | RB-05-0020 | N/A | WGA3D |

| 4a. ...HERE OBTAINED (City, State/Country) | 4b. DATE OBTAINED | 5. FILE TITLE |
|---|---|---|
| Tumon, Guam | 09-08-2005 | MESA, Joseph Anthony |

| 6a. REFERRING AGENCY (Name) | 6b. REFERRAL | | |
|---|---|---|---|
| | ☐ Case No. OR ☐ Seizure No. No. | 7. DATE PREPARED 09-09-2005 | 8. GROUP NO. 5 |

| 9. Exhibit No. | 10. FDIN (10 characters) | 11. ALLEGED DRUGS | 12. MARKS OR LABELS (Describe fully) | APPROX. GROSS QUANTITY | | 15. Purchase Cost |
|---|---|---|---|---|---|---|
| | | | | 13. Seized | 14. Submitted | |
| 1 | | Crystal Meth | 11 small straws with red stripes sealed on both ends containing a white crystal -like substance | 2 gg | 23 gg | N/A |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |

**16. WAS ORIGINAL CONTAINER SUBMITTED SEPARATE FROM DRUG?**  ☒ NO (included above)  ☐ YES (if Yes, enter exhibit no. and describe original container fully)

**REMARKS:**
Exhibit #1 is 11 small plastic straws containing a white crystal-like substance seized from the Guam Reef Hotel, Room #755, located at 1317 Pale San Vitores Road, Tumon, Guam. This exhibit was seized on 9/8/2005, by SA Danny Cho pursuant to the execution of a Federal Search Warrant at the above listed address. SA Cho maintained custody of this exhibit and transported it to the Guam RO, where SA Cho processed it into evidence as witnessed by TFO Frank Santos. This exhibit will be forwarded via FedEX to the DEA Southwest Lab for analysis ...safekeeping.

| ...MITTED BY SPECIAL AGENT (Signature) | 18. APPROVED BY (Signature & Title) |
|---|---|
| Danny Cho, SA | Antonio M. Marquez, RAC |

### LABORATORY EVIDENCE RECEIPT REPORT

| 19. NO. PACKAGES | 20. RECEIVED FROM (Signature & Date) | 21. Print or Type NAME and TITLE |
|---|---|---|
| 11 HSC | FX 8528 8435 6553 | |
| 22. SEAL ☐ Broken ☒ Unbroken | 23. RECEIVED BY (Signature & Date) 9/13/05 | 24. Print or Type NAME and TITLE Johnny Chong, Evidence Technician |

### LABORATORY REPORT

185242

**25. ANALYSIS SUMMARY AND REMARKS**

Ex. #1

Gross Wt.:    26.3 gm
Net Wt.:     1.0 gm
Contains:    d-Methamphetamine HCl

```
GOVERNMENT
EXHIBIT
A
CARDEL 800-783-6005
```

| 26. Exhibit No. | 27. Lab. No. | 28. ACTIVE DRUG INGREDIENT (Established or Common Name) | CONCENTRATION | | | 32. AMT. OF PURE DRUG | 33. RESERVE |
|---|---|---|---|---|---|---|---|
| | | | 29. Strength | 30. Measure | 31. Unit | | |
| 1 | 185242 | d-Methamphetamine HCl | 96 | % | — | 0.96 gm | 0.95 gm |

| 34. ...LYST (Signature) | 35. TITLE | 36. DATE COMPLETED |
|---|---|---|
| Monica S. Price | Forensic Chemist | 09/27/05 |
| 37. APPROVED BY (Signature & Date) William F. Phillips 9-30-05 | 38. TITLE Laboratory Director | 39. LAB. LOCATION Vista, CA |

DEA Form - 7
(Sept. 1995)

Previous edition dated 4/90 may be used until stock is exhausted.

3 - Lab File

U.S. Department of Justice
Drug Enforcement Administration

# REPORT OF DRUG PROPERTY COLLECTED, PURCHASED OR SEIZED

Follow instructions on Reverse before completing.

| 1. HOW OBTAINED (Check) | 2a. FILE NO. | 2b. PROGRAM CODE | 3. G-DEP ID |
|---|---|---|---|
| ☐ Purchase ☒ Seizure ☐ Free Sample ☐ Lab. Seizure ☐ Money Flashed ☐ Compliance Sample (Non-Criminal) Internal Body Carry ☐ Other (Specify) | RB-05-0020 | N/A | WGA3D |

| 4a. WHERE OBTAINED (City, State/Country) | 4b. DATE OBTAINED | 5. FILE TITLE |
|---|---|---|
| Tumon, Guam | 09-08-2005 | MESA, Joseph Anthony |

| 6a. REFERRING AGENCY (Name) | 6b. REFERRAL | | |
|---|---|---|---|
| | ☐ Case No. OR ☐ Seizure No. No. | 7. DATE PREPARED 09-09-2005 | 8. GROUP NO. 5 |

| 9. Exhibit No. | 10. FDIN (10 characters) | 11. ALLEGED DRUGS | 12. MARKS OR LABELS (Describe fully) | 13. Seized | 14. Submitted | 15. Purchase Cost |
|---|---|---|---|---|---|---|
| | | | | APPROX. GROSS QUANTITY | | |
| 2 | | Crystal Meth | A small paper cup | 3 gg | 26 gg | N/A |
| | | | containing zip-loc bag | | | |
| | | | further containing a white | | | |
| | | | crystal-like substance | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |

**16. WAS ORIGINAL CONTAINER SUBMITTED SEPARATE FROM DRUG?** ☒ NO (included above) ☐ YES (If Yes, enter exhibit no. and describe original container fully)

**REMARKS:**

Exhibit 2 is a small paper cup containing zip-loc bag further containing a white crystal-like substance seized from Joseph Anthony MESA at Guam Reef Hotel room #755, located at 1317 Pale San Vitores Road, Tumon, Guam. This exhibit was seized on 9/8/2005, by SA Danny Cho pursuant to a Federal Search Warrant at the above listed address. SA Cho maintained custody of the exhibit and transported it to the Guam RO, where SA Cho processed it into evidence as witnessed by TFO Frank Santos. This exhibit will be forwarded via FedEx to the DEA Southwest for analysis and safekeeping.

| SUBMITTED BY SPECIAL AGENT (Signature) | 18. APPROVED BY (Signature & Title) |
|---|---|
| Danny Cho, SA *[signature]* | Antonio M. Marquez, RAC *[signature]* |

## LABORATORY EVIDENCE RECEIPT REPORT

| 19. NO. PACKAGES ① HSEE | 20. RECEIVED FROM (Signature & Date) FX 8528 8435 6553 | 21. Print or Type NAME AND TITLE |
|---|---|---|
| 22. SEAL ☐ Broken ☒ Unbroken | 23. RECEIVED BY (Signature & Date) *[signature]* 9/13/05 | 24. Print or Type NAME AND TITLE |

## LABORATORY REPORT

**25. ANALYSIS SUMMARY AND REMARKS** 185243

Ex. #2

Gross Wt.: 27.1 gm
Net Wt.: 0.99 gm
Contains: d-Methamphetamine HCl

GOVERNMENT EXHIBIT
B

| 26. Exhibit No. | 27. Lab. No. | 28. ACTIVE DRUG INGREDIENT (Established or Common Name) | 29. Strength | 30. Measure | 31. Unit | 32. AMT. OF PURE DRUG | 33. RESERVE |
|---|---|---|---|---|---|---|---|
| | | | CONCENTRATION | | | | |
| 2 | 185243 | d-Methamphetamine HCl | 96 | % | — | 0.95 gm | 0.85 gm |
| | | | | | | | |

| 34. ANALYST (Signature) | 35. TITLE | 36. DATE COMPLETED |
|---|---|---|
| Monica S. Price *[signature]* | Forensic Chemist | 09/22/05 |

| 37. APPROVED BY (Signature & Date) | 38. TITLE | 39. LAB. LOCATION |
|---|---|---|
| William F. Phillips *[signature]* 9-22-05 | Laboratory Director | Vista, CA |

DEA Form - 7
(Sept. 1995)

Previous edition dated 4/90 may be used until stock is exhausted.

054

3 - Lab File



JOHN T. GORMAN
Federal Public Defender
First Hawaiian Bank Building
400 Route 8, Suite 501
Mongmong, Guam 96910
Telephone:     (671) 472-7111
Facsimile:     (671) 472-7120

Attorney for Defendant
JOSEPH ANTHONY MESA

FILED
DISTRICT COURT OF GUAM
DEC - 6 2005
MARY L.M. MORAN
CLERK OF COURT

IN THE UNITED STATES DISTRICT COURT

FOR THE TERRITORY OF GUAM

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CR 05-00066 |
| | ) | |
| Plaintiff, | ) | DEFENDANT'S MOTION TO FILE |
| | ) | SUPPLEMENTAL AFFIDAVIT IN |
| vs. | ) | SUPPORT OF MOTION TO SUPPRESS; |
| | ) | DEFENDANT'S SUPPLEMENTAL |
| JOSEPH ANTHONY MESA, | ) | AFFIDAVIT IN SUPPORT OF MOTION |
| | ) | TO SUPPRESS |
| Defendant. | ) | |
| | ) | |

Defendant, JOSEPH ANTHONY MESA, by and through counsel, John T. Gorman,

Federal Public Defender, files this Motion to file Supplemental Affidavit in Support of Motion to

Suppress. Defendant filed his Motion to Suppress Physical Evidence on October 24, 2005. The

government filed its Opposition to Defendant's Motion to Suppress on November 7, 2005.

Defendant Mesa filed his Reply to the Government's Opposition to Defendant's Motion to Suppress

on November 25, 2005. The initial hearing on the Motion to Suppress was held on December 5,

2005, before the Honorable Joaquin V.E. Manibusan, Jr., United States Magistrate Judge.

Magistrate Judge Manibusan heard argument on the issue of "Standing" on that date and continued

the hearing pending his ruling. It is undisputed that the search warrant affidavit attached in the

GOVERNMENT
EXHIBIT
C

Government's Opposition averred that the defendant had been staying at the Guam Reef Hotel, Tumon, Guam, for 3 days in September, 2005. The defendant argued that this undisputed evidence, put forth in the government's court filings, established defendant's standing in this matter. In addition, the defendant respectfully submits the following Supplemental Affidavit.

DATED: Mongmong, Guam, December 6, 2005.

JOHN T. GORMAN
Attorney for Defendant
JOSEPH ANTHONY MESA

## DEFENDANT'S SUPPLEMENTAL AFFIDAVIT
## IN SUPPORT OF MOTION TO SUPPRESS

I, JOSEPH ANTHONY MESA, hereby declare as follows:

1.      That I am the defendant in the above-captioned case.

2.      That I was staying in and residing at the Guam Reef Hotel, Tumon, Guam, from September 6, 2005 to September 8, 2005.

3.      That I was a resident of and staying in Room 755, Guam Reef Hotel on September 8, 2005, when the search warrant in this case was served. In addition, I had clothes and other personal effects in that room at that time.

//

//

//

2

4.      That the facts and statements set forth in the foregoing document are true and correct to the best of my knowledge and belief.

I DECLARE UNDER PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND CORRECT TO THE BEST OF MY KNOWLEDGE AND BELIEF.

DATED: Mongmong, Guam, December 6, 2005.

_Joseph A. Mesa_
JOSEPH ANTHONY MESA

3

## CERTIFICATE OF SERVICE

I, RENATE DOEHL, hereby certify that a true and exact copy of the foregoing

document was duly mailed and/or hand-delivered to the following on December 6, 2005:

MARIVIC P. DAVID
Assistant United States Attorney
Sirena Plaza
108 Hernan Cortez, Ste. 500
Hagatna, Guam  96910

Attorney for Plaintiff
UNITED STATES OF AMERICA

PATRICK CIVILLE
Civille & Tang
330 Hernan Cortes Avenue Ste. 200
Hagatna, Guam 96910
Attorney for Ginger Perez Hamamoto

JOAQUIN C. ARRIOLA, JR.
Arriola, Cowan & Arriola
259 Martyr Street, Suite 201
C&A Professional Building
Hagatna, Guam 96910
Attorney for Jeffrey Anthony Espinosa

RAWLEN MANTANONA
Cabot & Mantanona
Bank Pacific Building
825 S. Marine Drive
Tamuning, Guam 96913
Attorney for Shardae Roxanne U. Love

DATED: Mongmong, Guam, December 6, 2005.

RENATE DOEHL
Operations Administrator

JOHN T. GORMAN
Attorney for Defendant
JOSEPH ANTHONY MESA

1

2

3

4

5          IN THE DISTRICT COURT OF GUAM

6             TERRITORY OF GUAM

7                 \* \* \*

**FILED**

DISTRICT COURT OF GUAM

MAR 15 2006

**MARY L.M. MORAN**
**CLERK OF COURT**

8

9   UNITED STATES OF AMERICA,    )

10            Plaintiff,      )

11     vs.                    )    CRIMINAL CASE

12                          )      NO. CR05-00066

13   JOSEPH ANTHONY MESA, et al.,   )

14            Defendants.     )
    _____)

15

16

17            TRANSCRIPT OF PROCEEDINGS

18                  BEFORE

19     THE HONORABLE JOAQUIN V.E. MANIBUSAN, JR.

20               Magistrate Judge

21

22      **CONTINUED MOTION TO SUPPRESS EVIDENCE**

23       **WEDNESDAY, JANUARY 25, 2006**

24

25

GOVERNMENT
EXHIBIT
D
CARDILLO 800-781-0398

Wanda M. Miles
Official Court Reporter
District Court of G

**APPEARANCES:**

FOR THE PLAINTIFF:
    UNITED STATES ATTORNEY'S OFFICE
    BY: MARIVIC DAVID, Esq.
    ASSISTANT UNITED STATES ATTORNEY
    Suite 500, Sirena Plaza
    108 Hernan Cortez Avenue
    Hagatna, Guam 96910

FOR DEFENDANT MESA:
    FEDERAL PUBLIC DEFENDER OFFICE
    BY: JOHN GORMAN, Esq.
    Federal Public Defender
    First Hawaiian Bank Building
    Mongmong, Guam 96910

FOR DEFT. ESPINOSA:
    ARRIOLA COWAN & ARRIOLA
    Attorneys At Law
    BY: JOAQUIN P. ARRIOLA, ESQ.
    259 Martyr Street, #201
    Hagatna, Guam 96910

FOR DEFT. HAMAMOTO:
    CIVILLE & TANG LAW OFFICES
    BY: G. PATRICK CIVILLE, ESQ.
    And also by:
    Ms. Sirena Perez Cassidy, Esq.
    330 Hernan Cortez Ave, Suite 200
    Hagatna, Guam 96910

FOR DEFENDANT LOVE:
    RAWLEN MANTANONA, Esq.
    Attorney At Law

Wanda M. Miles
Official Court Reporter

I-N-D-E-X

| Government Witness | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| Danny Cho | 6 | 36 (By Mr. Gorman) | | |
| | | 77 (By Mr. Arriola) | | |
| | | 88 (By Mr. Civille) | | |
| | | | 98 | |

---

E-X-H-I-B-I-T-S

| Government Exhibit | Identified | Admitted |
|---|---|---|
| 1 - Booking photo of Shardae Love | 10 | 99 |
| 2 - Search Warrant Affidavit | 16 | 99 |
| 3 - Search Warrant | 18 | 99 |
| 4 - Photo of Mesa with search warrant | 29 | 99 |
| 5 - Photo of Room 755 (contents) | 31 | 99 |
| 6 - Photo of items on safe in closet | 32 | 99 |
| 7 - Photo of Room 755 | 32 | 99 |
| 8 - Photo of room 755 | 33 | 99 |
| 9 - Photo of matchbooks | 34 | 99 |
| 10 - Photo of items found in Rm 755 | 34 | 99 |
| 11 - Photo of items found in Rm 755 | 35 | 99 |

| Defense Exhibit | | |
|---|---|---|
| A - DEA manual | 42 | 99 |

Wanda M. Miles
Official Court Reporter

1  in the briefing site, did they also follow you to the

2  hotel?

3      A.   Yes.

4      Q.   For the entry, approximately how many officers

5  made up the entry team?

6      A.   Entry team?

7      Q.   Yes.

8      A.   Entry team was consisted of the Violent Street

9  Crimes members, so five, five to six people, including

10 myself in the entry.

11     Q.   Okay.  And what is an entry team?

12     A.   Entry team is the people who would first enter

13 the room to secure the premises.

14     Q.   Okay.  How were you dressed that evening?

15     A.   Just casual, just the casual clothes, with a

16 vest on, with the police sign.

17     Q.   Okay.  And what about the other people that

18 made up the entry team, were they in uniforms?  How

19 were they dressed?

20     A.   They were not in the police uniform, just the

21 casual clothing with the police vest on.

22     Q.   So, can you explain how the entry occurred?

23     A.   The Shardae Love, me and Shardae Love walked

24 over to the door and she was standing in the center,

25 I was standing on her left side away from, a little bit

1   away from the door because of the peephole, we don't

2   want the occupants inside to see that there was a

3   police presence.  So, and then Shardae Love knocked on

4   the door.

5       Q.   Okay.  And was there a long wait in response

6   to the knock?

7       A.   They didn't open the door right away, there

8   was in the background, there was a TV sound, but it was

9   about -- it was kind of a long pause after knocking the

10  door.  I believe she knocked on the door, and there was

11  no response, and I believe she knocked it again,

12  knocked on the door again.

13      Q.   And what did you observe happen after the

14  knock?

15      A.   After the knock, and, it sounded like -- I

16  couldn't see it, but it appeared to be, there was a

17  person by the door from inside and kind of looking --

18  sounded like the person was standing front of door from

19  inside, maybe checking outside who was knocking on the

20  door, and I heard the opening of the door.

21      Q.   As this was occurring, where were the other

22  people that made up the entry team?

23      A.   They, they were lining up on the, if you face

24  the hotel door, on the left side against the wall they

25  lined up.

1      Q.    So, were they -- would they be seen through

2    the peephole, in other words?

3      A.    No, they were not able to be seen yet, because

4    they were standing on the left side against the wall.

5      Q.    Okay. So, what happened when you entered?

6      A.    We entered, and the first person we

7    encountered was Ginger Hamamoto, and, and then further

8    inside was Jeff Espinosa, and Joe Mesa were present.

9    Also there was a baby inside the room as well.

10     Q.    Okay. When you say the first person you

11   encountered was Ginger Hamamoto, like where was she in

12   relation to the room?

13     A.    She was, she was the one that opened the door,

14   so she was the first encounter when she opened the

15   door, and then she was the first person in.

16     Q.    Okay. Can you try to describe what you see

17   when you entered, when you entered this hotel room?

18     A.    There was the different containers of

19   chemicals and glasswares, plastic container with the

20   tubing attached to it, bluish color of the chemical in

21   a bottle, big garbage trash bag filled with the, couple

22   of the papers and other trash.

23     Q.    So this is what you saw when you walked

24   inside?

25     A.    Once we walk through, made our entry inside,

1   yeah, that's what we observed.

2       Q.   Okay.   What did you do when you made entry?

3       A.   When we made entry, and then when I saw the

4   officers securing the room, and then the securing the

5   occupants of the room, I went to -- I did a security

6   sweep if there were any turned-on hot plates or any

7   chemicals were being heated in any -- in that nature.

8       Q.   And did you find any?

9       A.   Nothing was on the -- no plates were turned on

10  to heat the chemicals.   Pretty much it was, there was

11  no like operating meth lab there.

12      Q.   Okay.   And after you did the security sweep,

13  what else did you do?

14      A.   Because of the odor I wanted to neutralize the

15  air inside, so me and the officer, or officer, we

16  opened the balcony window to just ventalize the air.

17      Q.   What do you mean about the odor you noticed?

18      A.   It was a chemical odor, fuel odor, that

19  normally is a common smell, from my experience, it's a

20  common smell that you would have, you would smell when

21  you walk into a meth lab.

22      Q.   Were you able to smell this odor before you

23  entered?

24      A.   No, we, actually there was -- I couldn't smell

25  the chemical odor from outside when door was closed.

Wanda M. Miles
Official Court Reporter

1    Q.   Approximately how long did it take between
2  your entry until you opened the doors to neutralize the
3  air?

4    A.   I would say maximum of a minute, less than a
5  minute I would say.

6    Q.   And what door did you have to open to
7  neutralize the air?

8    A.   The balcony, the window.

9    Q.   So what happened next after you opened the
10  balcony window?

11    A.   Then just the ventilating the air inside, and
12  once I felt that the air was neutralized and felt safe
13  for the other officers to come in, or actually when we
14  made our entry, and once we secured the occupants of
15  the hotel room, they were taken out of the room and we
16  put them in the hallway; in the meantime during that
17  time I was opening the balcony door and ventilating the
18  air.

19    Q.   And how long did it take until the air had
20  been neutralized?

21    A.   Just a few minutes, max five, five to ten
22  minutes I would say.

23    Q.   And --

24    A.   Approximately ten minutes.

25    Q.   Okay.  Then what did you do?

1    A.    Then the -- photograph the hotel room, the

2    chemicals and stuff they had in the room.

3    Q.    Were you all silent when you entered the door?

4    A.    I'm sorry?

5    Q.    Were you quiet when you entered the door?

6    A.    No, when we were entering the door, once the

7    door was opened, then we announced our presence.

8    Q.    Okay.  And what was said?

9    A.    We announced our "police, police", drug --

10   well, just said "police, police" and "put your hands

11   up", "get down on the floor", that nature.

12   Q.    Okay.  And was there a discussion about the

13   search warrant?

14   A.    With?

15   Q.    When you entered the room?

16   A.    When we entered the room, once that room was

17   ventalized, and then when we brought the occupants back

18   into the room I explained to the occupants that we had

19   a federal search warrant to search this room, 755.

20   Q.    Okay.  And where was this explanation made?

21   A.    Inside the room.

22   Q.    And how did you explain this?

23   A.    I verbally explained to the occupants that the

24   reason we are here is to search this room with the

25   court-signed federal search warrant.

1    Q.    You have Government Exhibit 5; do you

2    recognize that photograph?

3    A.    Yes.

4    Q.    And what is that a photograph of?

5    A.    That's the photo that I took inside the Room

6    755, and those items were the fuel and the Red Devil

7    Eye, and along with the chemicals, and the coffee pot,

8    they was located inside the closet of that room.

9    Q.    And where was the closet in relation to the

10    room?

11    A.    As soon as you enter the room, it was on the

12    immediate left.

13    Q.    And was the closet open or closed when you

14    entered?

15    A.    When I entered it was open.

16    Q.    (Presenting another document to the witness.)

17    What is Government Exhibit 6?

18    A.    Exhibit 6 is also a photo that I took in the

19    room showing the Pyrex measuring cup, and inside the

20    Pyrex measuring cup is coffee, what you call it, coffee

21    filter container.

22    Q.    And what is underneath the cups and filter?

23    A.    It's a safe.

24    Q.    Okay.  And where -- where was that located?

25    A.    That was located I believe, if I remember

1 correctly, it was by, adjacent to where the TV was

2 located.

3     Q.    It wasn't in the closet?

4     A.    No, I'm not really sure.  It could be; I can't

5 really remember correctly.

6     Q.    Okay.

7     A.    Looks like --

8     Q.    Did you want to add?

9     A.    Yeah.  The way, when I was looking more

10 closely at this picture, I see it's inside the closet.

11     Q.    And how did you recognize that to be inside

12 the closet?

13     A.    Because of the door of the closet.

14     Q.    Okay.  You're talking about the louvered

15 doors?

16     A.    Yes.

17     Q.    And is a portion of that reflected on

18 Government Exhibit 6?

19     A.    Yes.

20     Q.    Next is Government Exhibit 7; what is that a

21 picture of?

22     A.    That's another photo that I took inside the

23 Room 755; this was taken right by the balcony window.

24     Q.    Okay.  And what is on -- what do you see?

25     A.    In this photo, I took a photo of the electric

```
 1   heating metal plate, also the police scanner, a radio,
 2   and duct tape and plastic jar filled with water.
 3       Q.   And --
 4       A.   Liquid.
 5       Q.   What's underneath those items you mentioned?
 6       A.   Underneath?
 7       Q.   Are they resting on something?
 8       A.   It was -- it was a chair, so --
 9       Q.   All right.  And where was that -- where was
10   that viewed in relation to the room?
11       A.   Once you entered the room, then far to the
12   left side against the balcony window.
13       Q.   I'm next showing you Government Exhibit 8; do
14   you recognize that?
15       A.   Yes, that's the photo that I took inside the
16   Room 755.
17       Q.   And what is that a picture of?
18       A.   A picture of the small straws containing
19   crystal-like substance.
20       Q.   Okay.  Where were the straws?
21       A.   Those straws were just laying around on the
22   carpet right by the chair that, I think it was exhibit,
23   Government Exhibit 7, where the heating, electric
24   heating metal plate and police scanner was found.  It
25   was right next to that chair.  These straws were found
```

1   on the floor.

2        Q.   Okay.  And how many straws were on the floor,

3   were discovered?

4        A.   Probably 11 small straws.

5        Q.   Were they empty?

6        A.   No, those small straws were containing the

7   crystal-like substance.

8        Q.   Next is Government Exhibit 9; what is that a

9   picture of?

10       A.   That's a picture, another photo that I took in

11  the room, a picture of the matchbook boxes.

12       Q.   And where were the matchbook boxes in relation

13  to the room?

14       A.   They were found right behind the chair that,

15  the chair that was in Government Exhibit 7.

16       Q.   Okay.

17       A.   Right up against the balcony window.

18       Q.   And showing you next Government Exhibit 10;

19  what is that a picture 6?

20       A.   Picture of the plastic storage container

21  further containing the straws and the acetone chemical.

22       Q.   And where was this plastic container in

23  relation to the room?

24       A.   This was located right next to where TV was

25  in the room.

1    Q.    Government Exhibit 11; what is that a picture

2    of?

3    A.    That is a picture of a paper -- paper cup

4    containing the clear Ziploc bag that contained the

5    crystal-like substance.

6    Q.    And where was that paper cup with the Ziploc

7    bags found?

8    A.    That was found on Joe Mesa, inside the pocket,

9    front inner side pocket.

10   Q.    Approximately when was that found; can you

11   explain how that paper cup was found?

12   A.    When Joe Mesa was arrested, and this was when

13   we did the patdown for any weapons or contrabands,

14   that's when it was found.

15   Q.    Approximately what time did you leave the room

16   in the hotel?

17   A.    I left the hotel at approximately 11:00 p.m.

18   the same day.

19          MS. DAVID:  No further questions, Your Honor.

20          THE COURT:  All right, let's take a break at

21   this time before we have cross-examination, a ten-

22   minute break.

23          (Recess was taken.)

24          (Proceedings resumed at 10:51 a.m.)

25          THE COURT:  All right, we'll begin with

Wanda M. Miles
Official Court Reporter
District Court of Guam

1 informants have called you and told you that there was

2 a meth lab operating in a hotel?

3     A.    I think this is the second time.

4     Q.    Twice?

5     A.    Right.

6     Q.    So it would be fair to say that an operating

7 meth lab in a hotel is not a common phone call that you

8 receive?

9     A.    Correct.

10     Q.    Okay.  Now, meth labs, and you have some

11 experience in meth labs, you testified on direct?

12     A.    Correct.

13     Q.    Have you been trained by the DEA also

14 regarding meth labs in addition to your practical

15 experience?

16     A.    Yes.

17     Q.    Meth labs, would it be fair to say meth labs

18 are inherently dangerous; would that be fair to say?

19     A.    Correct.

20     Q.    One reason meth labs are so dangerous is that

21 there's a potential -- they are probably explosive, is

22 that correct?

23     A.    Correct.

24     Q.    You're cooking a witch's brew of cocktails

25 that are extremely dangerous, and that's why, one

Wanda M. Miles
Official Court Reporter
District Court of Guam

1  reason meth labs are explosive and extremely dangerous;

2  is that fair to say?

3     A.    They're dangerous, yes.

4     Q.    Okay.  Another reason that meth labs are

5  dangerous is that they produce hazardous materials,

6  that is, the by-products that are produced are

7  chemicals that can burn or poison you, and they're also

8  an environmental disaster; correct?

9     A.    Correct.

10     Q.    Another reason meth labs are so dangerous is

11  that they're unregulated, these are -- I mean they're

12  obviously illegal so there's no one over, supervising

13  the operation of these labs; is that correct?

14     A.    Right.

15     Q.    Another reason meth labs are dangerous is

16  that oftentimes the people who are cooking are

17  inexperienced, they're not trained chemists; is that

18  fair to say?

19     A.    Correct.

20     Q.    Now, another reason, the fifth reason why

21  meth labs are so dangerous is that these people are

22  drug dealers, and you know from your experience that

23  drug dealers are often armed?

24     A.    Correct.

25     Q.    Okay.  So they have six separate reasons as

1    to how dangerous meth labs are; isn't that correct?

2         A.    Correct.

3         Q.    Compounding this, in this case, is the fact

4    that it's happening in a hotel which is full of people,

5    this isn't an isolated shack out in the boonies, this

6    is a hotel full of people, so this is -- so that adds

7    another whole element of danger to this case; is that

8    correct?

9         A.    Correct.

10        Q.    Okay.  Now, after you received this tip, this

11   anonymous information, you say you contacted the GPD

12   Violent Street Crimes unit; is that correct?

13        A.    Correct.

14        Q.    You talked to Officer Sablan?

15        A.    Correct.

16        Q.    Was this a face-to-face meeting or was this a

17   telephone meeting?

18        A.    Telephone meeting.

19        Q.    And how many times did you talk with Officer

20   Sablan?

21        A.    Telephone?  Telephonically?

22        Q.    Uh-huh.  Say in the afternoon between 1:30 on

23   September 8th, '05, and when you went to the hotel at

24   4:00 p.m., how many times telephonically did you speak

25   with Norbert Sablan regarding this case?

1  with that task.  Pretty much law -- other law

2  enforcement just took it upon themselves and pretty

3  much knew what to do in the perimeter area.

4      Q.  Were you the officer in charge of this

5  operation?

6      A.  Yes.

7      Q.  Okay.  Now the rooms on either side of Room

8  755, were those evacuated?

9      A.  I'm sorry?

10      Q.  The rooms to the right and to the left

11  immediately adjacent, that share common walls with room

12  755, did you evacuate those rooms?

13      A.  No.

14      Q.  The rooms across the hall, did you evacuate

15  any of those rooms?

16      A.  Rooms across the hall, there are no rooms

17  across the hall.

18      Q.  Okay.  Did you evacuate any civilians from

19  that floor?

20      A.  No.

21      Q.  Okay.  Did you take any precaution at all for

22  the guests and the employees of the Reef Hotel on that

23  date?

24      A.  Gave them the -- informed the hotel security

25  manager that, what to expect, but I told him that they

1    could be -- because I explained to the manager that

2    it's going to be a small scale meth lab, so, it's not,

3    it's not like a mega size meth lab that I would

4    normally encounter in California. Here, based on my

5    experience on Guam, it's pretty much a small scale

6    makeshift meth lab, so it's not -- I wouldn't, at that

7    time I didn't consider it as much dangerous as the meth

8    lab that I had encountered in the past in California.

9        Q.    But even small, would you agree with me that

10   even small scale meth labs are a danger due to their

11   explosiveness, due to their hazardous materials, due to

12   the fact that criminals, drug dealers are often armed

13   in your experience, and all the other factors that I

14   talked about earlier, even a small scale meth lab,

15   would you not agree with me, is a dangerous --

16       A.    Correct.

17       Q.    -- a dangerous thing?

18            Shardae Love at that point, you said in direct

19   earlier she was a cooperating witness basically, she

20   was cooperating with you?

21       A.    Correct.

22       Q.    What precautions did you take for Ms. Love

23   when you placed her at the front of that door?

24       A.    There was no chemical odors coming out of that

25   room when we stood by the door, and that the precaution

1     was that once she knocks on the door and once the door

2     was going to be opened, and she was going to be put

3     aside away from the hotel, that Room 755.

4       Q.    Is that standard procedure, that the Drug

5     Enforcement Agency would take a civilian and place them

6     in the middle of a situation like this?

7       A.    I wouldn't say it's a common practice, but as

8     a law enforcement personnel, we, we practice and we use

9     ruse when we serve a search warrant at locations.

10       Q.    Absolutely. And the use of ruses is approved

11     by the courts. That wasn't my question though. My

12     question though, because you certainly could have used

13     a ruse and pretended you were a pizza man or a hotel

14     delivery. And you're a trained, experienced police

15     officer.

16       My question is: Is it common practice for the

17     Drug Enforcement Administration to use a civilian in

18     the service of an operation -- in the operation of the

19     service of a search warrant on a dangerous meth lab; do

20     you think that's common practice?

21       A.    No.

22       Q.    Okay. You testified earlier on direct that

23     when you went by this room prior to service of the

24     warrant, you could hear the TV in there?

25       A.    Correct.



GOVERNMENT
EXHIBIT
5




GOVERNMENT
EXHIBIT
6





GOVERNMENT
EXHIBIT
7



GOVERNMENT
EXHIBIT
8







GOVERNMENT
EXHIBIT

9



8 10:04PM



GOVERNMENT
EXHIBIT
*10*





GOVERNMENT
EXHIBIT
11